UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES and FRIENDS OF THE CLEARWATER,<br><br>                Plaintiffs,<br><br>     v.<br><br>RICK BRAZELL, Supervisor of the Nez Perce National Forest; FAYE KRUEGER, Regional Forester of Region One of the U.S. Forest Service; UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture; and UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of Interior,<br><br>                Defendants. | Case No. 3:12-cv-00466-MHW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Plaintiffs Alliance for the Wild Rockies ("AWR") and Friends of the Clearwater ("FOC") challenge the 2012 Record of Decision of the U.S. Forest Service ("Forest Service") to approve the Little Slate Project ("Project") which authorizes improvement of

conditions in the Little Slate Creek watershed through various means described below. (FS221, 229.)  Now pending before the Court are Plaintiffs' Motion for Summary Judgment (Dkt. 23) and Defendants' Cross Motion for Summary Judgment (Dkt. 24).[1] The Court held oral argument on the Motions on September 4, 2013.

Having carefully reviewed the record and having considered the briefing and oral arguments of the parties, the Court enters the following Order denying Plaintiffs' Motion and granting Defendants' Motion for the reasons set forth below.

## BACKGROUND

**1.      Procedural History**

On July 28, 2011, the Forest Service published legal notice of the Little Slate Draft Environmental Impact Statement ("DEIS").  (FS1-202.)  On March 2, 2012, the Forest Service published legal notice of the Little Slate Final Environmental Impact Statement ("FEIS") (FS215-544) and Record of Decision ("ROD") (FS573-721).  Plaintiffs had timely provided public comments on the DEIS and filed appeals of the ROD.  On May 25, 2012, Deputy Regional Forester Cottrell signed the appeal denial and authorized implementation of the Project.  (FS22789-22802.)  On June 11, 2012, Plaintiffs sent to Defendants a 60-day notice of intent to sue (FS23902-08) under the Endangered Species Act ("ESA") to which Forest Supervisor Brazell responded on July 26, 2012 concluding that the Project is in full compliance with the ESA.  (FS23909-922.)  Plaintiffs filed a

---

[1]   The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.SC. § 636(c).

**MEMORANDUM DECISION AND ORDER - 2**

supplemental notice of intent to sue under the ESA on August 1, 2012, providing

additional information obtained in response to a Freedom of Information Act request

("FOIA documents") regarding the alleged Canada lynx violations discussed in the initial

60-day notice.  (FS23946-971.)  On August 30, 2012, Forest Supervisor Brazell responded

to the supplemental 60-day notice again concluding that the Project is in full compliance

with the ESA.[2]

Plaintiffs now bring this action for judicial review under the Administrative

Procedure Act and the citizen suit provision of the Endangered Species Act claiming that

the ROD approving the Little Slate Project is arbitrary and capricious, an abuse of

discretion, and/or otherwise not in accordance with law.  They claim the approval violates

the National Environmental Policy Act, ("NEPA"), 42 U.S.C. § 4331, *et seq*., the National

Forest Management Act ("NFMA"), 16 U.S.C. § 1600, *et seq*., the Endangered Species

Act ("ESA"), 16 U.S.C. § 1531 *et seq*., and the Administrative Procedure Act ("APA"), 5

U.S.C. § 701 *et seq*.  *Compl*. ¶ 3.

Plaintiffs claim that the Forest Service failed to comply with: (1) NEPA's mandate

to consider and disclose environmental impacts, (2) NFMA's mandate to protect

biodiversity, and (3) the ESA's mandate to participate in consultation, mitigate harm, and

prevent irreparable injury to the environment.  *Compl*. ¶ 4.  Seeking declaratory and

injunctive relief, Plaintiffs request that the Court enjoin the Forest Service from

---

[2]  As noted later in this opinion, after the initial Complaint was filed, the Forest Service engaged in a consultation with FWS on the Canada lynx pursuant to the ESA.

implementing the Project until Defendants fully comply with the relevant statutory directives and further request attorney fees and expert witness fees. *Compl.* ¶¶ 4-6.

Plaintiffs summarize the impetus behind the filing of this action as "the Forest Service's apparent lack of knowledge concerning the current state of the species and habitats that will be impacted by Project activities and the Forest Service's failure to honestly disclose these limitations to the public." *Pls.' Mem.* at 1-2, Dkt. 23-1.

## 2.   Factual Summary

The Nez Perce National Forest (the "Forest") is located in Idaho County in the Idaho panhandle and contains over 2.2 million acres, 926,188 acres of which are permanently protected as wilderness. (FS2653; 2595.) The Forest contains the Gospel-Hump Wilderness, as well as parts of the Hells Canyon, Frank Church-River of No Return, and Selway-Bitterroot Wildernesses. (FS2653.) Approximately 150 miles of the Middle Fork of the Clearwater, Salmon, Selway, and Rapid Rivers – all of which are classified as wild and scenic rivers – flow through or adjacent to the Forest. (FS2653.) Over 80 percent of Idaho County is federal land, and the two major uses in the Forest are timber supply and recreation. (FS2653.)

The Forest also contains a large and diverse array of wildlife, some of which rely on old-growth habitat. (FS2657.) Under the Forest Plan, the Forest Service maintains at least 10 percent of the Forest's timbered acres as old-growth and has a prescribed burning schedule to actively manage wildlife habitat. (FS2658.) The Project area is popular for various recreational activities including hunting, fishing, camping, motorized trail use, and

**MEMORANDUM DECISION AND ORDER - 4**

sight-seeing.  (FS221.)

The stated purpose of the Project is to improve conditions in the Little Slate Creek watershed through aquatic habitat restoration, timber harvest, fuel treatments, and changes to the roads and trails in the area.[3]  (FS221; 229.)   Under the Project, the Forest Service plans to conduct timber harvest and fuel reduction treatment on up to 2,598 of the 2.2 million acres of the Forest to decrease the risk of a disastrous fire in the future.  Past mining, timber activities, and disease have caused an unnatural buildup of trees and vegetation susceptible to fire which has been aggravated by the absence of any wildfire in past years.  (FS221; 579).  The specific plans are described in the ROD.[4]

_____

[3]  The goals of the Project are to:

★  Improve watershed conditions and aquatic habitats to support recovery of aquatic species by: reducing sediment delivery, restoring connectivity of aquatic habitats, restoring stream side shade, improving stream bank stability and the hydrologic function of hillslopes.
★  Revise road and trail management to reduce resource impacts from roads, trails and OHV use. This includes designating a road and trail system for public motorized use.
★  Use timber harvest or slashing, and activity fuels treatments to achieve desired species distribution and structure by:
o  Regenerating aging lodgepole pine to recover economic value and provide early seral habitat.
o  Creating a more natural range of vegetation disturbance patterns by increasing the size of some past disturbance openings, while promoting some larger patches of mature forest.
o  Increasing the relative proportion of long-lived fire resistant tree species by restoring or regenerating to western larch or ponderosa pine, while maintaining existing large diameter trees.
★  Improve soils impacted from past mining and timber harvest activities in the project area.

ROD (FS580.)

[4]  The specific plans for the Project as set forth in the Record of Decision are:

★  Conduct timber harvest and fuel reduction treatments on 2,598 acres.
★  Decommission 49 miles, reconstruct 15 miles, and improve 63 miles of existing roads. Construct 12 miles of temporary roads and decommission them after use.
★  Complete 100-150 acres of soil restoration, 0.75 miles of riparian restoration, and 75 acres of

**MEMORANDUM DECISION AND ORDER - 5**

## STANDARDS OF REVIEW

**1.      Standard of Review under the APA**

Challenges to agency actions are reviewed under the deferential standard of the

Administrative Procedure Act ("APA").  *Tuscon Herpetological Soc. v. Salazar*, 566 F.3d

870, 875 (9th Cir. 2009).  This narrow APA standard dictates that a reviewing court may

set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  *Id.* (citing 5 U.S.C. § 706(2)(A)).  *See also*

*Siskiyou Regional Educ. Project v. U.S. Forest Service*, 565 F.3d 545 (9th Cir. 2009)

(NFMA); *North Idaho Community Action Network v. U.S. Dept. of Transportation*, 545

F.3d 1147 (9th Cir. 2008) (NEPA);  *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir.

2008) (en banc), *overruled on other grounds by Winter v. Natural Res. Def. Council*

(NEPA and NFMA).  The court "will reverse a decision as arbitrary or capricious only if

the agency relied on factors Congress did not intend it to consider, 'entirely failed to

consider an important aspect of the problem,' or offered an explanation 'that runs counter

---

gully stabilization. Complete instream channel rehabilitation at 13 sites.
★   Treat 59 road and 73 trail stream crossings.
★   Expand the existing rock quarry at the Road 536/441 junction by 2 acres to provide material for road reconstruction work.
★   On system roads, reduce yearlong motorized access by 2 miles and reduce seasonal motorized access by 13 miles.
★   Construct new or relocate 6 miles of trail, reconstruct 32 miles and decommission 4 miles of existing trail.
★   Add 1.2 miles of nonsystem trail to the Forest Service trail system. Decommission 2.7 miles of nonsystem trails.
★   Place seasonal travel restrictions on all motorized trails currently open to yearlong motorized use within the project area.

(FS579.)

**MEMORANDUM DECISION AND ORDER - 6**

to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *McNair*, 537 F.3d at 987 (citation omitted). Although the standard of review is narrow, the Court must engage in a "substantial inquiry" and "probing, in-depth review," and "the agency must present a rational connection between the facts found and the conclusions made." *Siskiyou*, 565 F.3d at 554 (internal quotations and citations omitted).

In conducting its review, the court must not assume the role of a scientist and need not agree with the agency's decision. *McNair*, 537 F.3d at 988. Rather, agencies have the discretion to rely on its own experts' reasonable opinions to resolve a conflict between or among specialists. *Id*. at 1000; *Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 378 (1989).

Except in limited circumstances, the Court's review is limited to review of the administrative record underlying the challenged decision. *Thompson v. Dept. of Labor*, 885 F.2d 551, 555 (9th Cir. 1989). The administrative record "'consists of all documents and materials directly or *indirectly* considered by the agency decision-makers and includes evidence contrary to the agency's position.'" *Id*. (quoting *Exxon Corp. v. Dept. of Energy*, 91 F.R.D. 26, 32 (N.D.Tex. 1981)) (emphasis in original). Judicial review should be focused on the record in existence at the time of the agency's decision. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (citation omitted); *Southwest Ctr. for Biological Diversity v. U. S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).

**MEMORANDUM DECISION AND ORDER - 7**

**2.      Summary Judgment Standard**

Motions for summary judgment are governed by Federal Rule of Civil Procedure Rule 56 which provides, in pertinent part, that judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Because review of agency actions is limited to the administrative record without triable facts, summary judgment may be granted to either party based on that review. *Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768, 778 (9th Cir. 2006).

## SUMMARY OF RELEVANT STATUTORY PROVISIONS

**1.      National Forest Management Act**

For each unit in the National Forest System, NFMA requires the Forest Service to develop a comprehensive management plan ("Forest Plan") with which any subsequent "plans, permits, contracts, and other instruments for the use and occupancy" must be consistent. *Earth Island Institute v. U.S. Forest Service*, 351 F.3d 1291,1300 (9th Cir. 2003) (citing 16 U.S.C. §§ 1604(a) and (i)). "The NFMA and its implementing regulations provide for forest planning and management by the Forest Service on two levels:  (1) forest level and (2) individual project level." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). "Forest Plans aim to balance environmental and economic concerns, while furthering NFMA's purpose to 'provide for diversity of plant and animal communities' in national forests." *Great Old Broads for Wilderness v.*

**MEMORANDUM DECISION AND ORDER - 8**

*Kimbell*, 709 F.3d 836, 850 (9th Cir. 2013) (citations omitted).  Substantial deference is

owed to the Forest Service's interpretation and implementation of its Forest Plan.  *Id*.

Therefore, a challenge under NFMA will prevail only if a Forest Service decision is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."

*Native Ecosystems Council*, 697 F.3d at 1056.

The Forest Service developed the current Forest Plan for the Nez Perce National

Forest in 1987 and has amended it on several occasions.  The Forest Plan, Overview,

Appendices, and Amendments are contained in the Administrative Record.  (FS2474-

2956.)

**2.     NEPA**

NEPA has been described as "our basic national charter for protection of the

environment."  *North Idaho Community Action Network v. United States Department of*

*Transportation*, 545 F.3d 1147, 1153 (9th Cir. 2008) (citing *Ctr. for Biological Diversity*

*v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)).  NEPA

requires agencies to have available and carefully consider "'detailed information

concerning significant environmental impacts' and make that information available to the

public."  *Id*. (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349

(1989)).  Stated another way, NEPA requires a federal agency to "'consider every

significant aspect of the environmental impact of a proposed action . . . [and] inform the

public that it has indeed considered environmental concerns in its decisionmaking

process.' . . .   In order to accomplish this, NEPA imposes procedural requirements

**MEMORANDUM DECISION AND ORDER - 9**

designed to force agencies to take a 'hard look' at environmental consequences." *Earth Island Institute*, 351 F.3d at 1300 (internal citations omitted).  NEPA "exists to ensure a process" as opposed to imposing substantive requirements on federal agencies.  *McNair*, 537 F.3d at 1000 (citation omitted).

Procedural requirements under NEPA and its regulations include a scoping process to determine whether an environmental impact statement is necessary, scientific analysis, expert agency comments, public involvement, discussion of significant environmental impacts, and disclosure of information regarding reasonable alternatives to the proposed action.  *See generally* 40 C.F.R. §§ 1500.1; 1502.1.  A DEIS  must disclose and discuss all major points of view on the environmental impact of alternatives to the proposed action as well as the proposed action itself.  40 C.F.R. § 1502.9.  An FEIS must respond to comments solicited and received from certain federal agencies, appropriate state and local agencies authorized to develop and enforce environmental standards, Indian tribes where necessary, the applicant, and the public.  40 C.F.R. § 1503.1.  Finally, an FEIS must respond to the comments using one of the options specified in the regulations and attach all substantive comments or summaries thereof.  40 C.F.R. § 1503.4.

**3.     Endangered Species Act**

The ESA imposes substantive and procedural duties on various federal agencies designed to protect endangered and threatened species.  *Conservation Congress v. U. S. Forest Service*, 720 F.3d 1048, 1051-52 (9th Cir. 2013) (citing 16 U.S.C. § 1531, *et seq.* and *Ctr. For Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1106 (9th

Cir. 2012)). Substantively, as relevant here, the Forest Service must insure that any project it authorizes "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id.* at 1052 (citing 16 U.S.C. § 1536(a)(2)). Procedurally, as relevant here, the Forest Service must consult with the Fish and Wildlife Service "to determine the likely effects of any proposed action on species and their critical habitat." *Id.* (citation omitted). "Critical habitat" is defined as areas that are "essential to" or "essential for" the conservation of a particular listed species. 16 U.S.C. §§ 1532(5)(A)(i), (ii).

## DISCUSSION

Each of Plaintiffs' five arguments alleges a NEPA violation. Two also allege NFMA violations. One alleges an ESA violation. The Court will address each argument in the order raised by Plaintiffs.

**1. The Forest Service's Alleged Violation of NEPA by Failing to Disclose and Take a Hard Look at Project Impacts on Canada Lynx and by Failing to Prepare a Supplemental NEPA Analysis of Post-lawsuit Lynx Analysis and Decision Documents**

In *Alliance for the Wild Rockies v. Lyder*, United States District Judge Donald W. Molloy provided a good summary of the characteristics of the Canada lynx and its habitat that provides helpful context to the arguments before this Court:

> *Lynx canadensis*, the Canada lynx ("lynx"), is a medium-sized cat similar in size and appearance to a bobcat. 74 Fed. Reg. 8616, 8616 (Feb. 25, 2009). Unlike the bobcat, lynx have long legs and large paws making them well-adapted for hunting and

**MEMORANDUM DECISION AND ORDER - 11**

surviving in areas that experience cold winters with "deep, fluffy snow." *Id.*

The lynx is a specialized predator of snowshoe hare, which comprises a majority of its diet. *Id.* at 8616-17.  With its adaptations for snowy conditions and diet heavily based on snowshoe hares, lynx habitat consists of "moist boreal forests that have cold, snowy winters and a snowshoe hare prey base." *Id.* at 8616.  The boreal forest landscape must be large enough to ensure adequate snowshoe hares are available.  *Id.*  The home range of an individual lynx varies based on the abundance of prey.  As snowshoe hare numbers decline, lynx require a broader landscape to survive and reproduce.  *Id.*

The contiguous United States is at the southern edge of the boreal forest range, resulting in limited and patchy forests that can support snowshoe hare and lynx populations.  Canada on the other hand, with an expansive boreal forest and fewer snowshoe hare predators and competitors such as bobcats, has higher lynx densities and an overall greater lynx population than found in the contiguous United States.  *Id.* at 8717.

*Alliance for Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126, 1127-28 (D. Mont. 2010).

In their original Complaint, Plaintiffs argued that the Forest Service and Fish and Wildlife Service violated the ESA and NEPA by failing to survey the Forest for Canada lynx as required by the Northern Rockies Lynx Management Direction Biological Opinion, failing to consult under Section 7 of the ESA on Project impacts to the Canada lynx even though there is evidence that the species "may be present" in the Project area, and failing to take a hard look at Project impacts to this species.  *Pls.' Mem.* at 3.  They raised their initial concerns in a 60-day notice of intent to sue under the ESA, and, after receiving a Freedom of Information Act ("FOIA") response with information allegedly not disclosed in the Project NEPA documents, raised additional concerns in a supplemental

60-day notice of intent to sue.[5]  *Pls.' Mem.* at 3-4 (citing FS23902-23908, FS 23927-

23945).  Plaintiffs contend that Defendants did not remedy any of the noted violations.

*Pls.' Mem.* at 4 (citing FS23909-23922; FS23946-23971).  Their argument continues that

although Defendants analyzed impacts and consulted on the Canada lynx *after* Plaintiffs

filed suit, they did not subject the resulting analysis, consultation, and decision documents

to NEPA review.  *Id*. at 5.  Plaintiffs view this as an attempt to circumvent the public

scrutiny requirement of NEPA and argue that the "post-hoc" ESA consultation and

findings were based on ESA standards rather than the separate and distinct NEPA

standards.  *Id*.

Because Defendants ultimately engaged in the ESA consultation with FWS, the

parties stipulated that Plaintiffs could amend their Complaint to withdraw their now moot

ESA claims for the Canada lynx and add a NEPA claim alleging the need for supplemental

NEPA analysis and review of the "new" Canada lynx consultation and decision

documents.  *Stipulation*, Dkt. 18.  Therefore, this claim now involves only a NEPA cause

of action against the Forest Service.  Plaintiffs additionally claim that the "post-hoc"

_____

[5]  In its Supplemental 60-Day Notice of Intent to Sue, Plaintiffs advised that they made a Freedom of Information Act request to the Nez Perce National Forest, the Clearwater National Forest, the United States Fish and Wildlife Service, and the Idaho Department of Fish and Game seeking information relating to Canada lynx surveys and presence on the Nez Perce National Forest.  (FS23927-29.)  Plaintiffs stated that three documents provided in response to the request indicated recent and reputable sightings of Canada lynx in the Forest and in the Project area not disclosed in the EIS.  Those documents were  email correspondence between the Forest Service and FWS dated July and August of 2006 (FS23930-33); email correspondence between a Fuels Management Specialist of the Payette National Forest to Joanne M. Bonn of the Forest Service dated November 2, 2010 (FS 23924); and a Lynx Sighting Report dated July 18, 2006 (FS23935).  Also included in the FOIA response were the Nez Perce National Forest 2007 Lynx Surveys Final Report (FS23936) and the Nez Perce National Forest 2008 Lynx Hair Snare Surveys Final Report (FS23941) each of which Plaintiffs contend were inadequate surveys.

consultation documents should not have been included in the Administrative Record.

**A.      Inclusion of Post-Decision and Post-Lawsuit Analysis, Consultation, and Decision Documents**

The Plaintiffs object to including in the Administrative Record the following "post-hoc" documents:  (1) the Forest Service's January 30, 2013 Little Slate Project Biological Assessment on the Canada Lynx concluding that the proposed action is "not likely to adversely affect" transient Canada lynx FS27324-27356); (2) the Forest Service's January 30, 2013 letter to the FWS requesting concurrence with the Biological Assessment (FS27357); (3) the FWS February 11, 2013 concurrence letter (FS27362-27370); and (4) various supporting charts/maps (FS27371-72; 27373-78; 27379-81; 27832-83; 27384).

Plaintiffs contend that inclusion of these documents in the Administrative Record was improper because they do not fall within any of the exceptions to the general rule that judicial review must focus on the administrative record in existence at the time of the agency decision.

As stated above, except in limited circumstances, the Court may consider only the administrative record as it existed at the time the challenged decision was made. *Thompson*, 885 F.2d at 555.  However, as Plaintiffs note, the Ninth Circuit recognizes four exceptions allowing judicial consideration of extra-record evidence:

> (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

**MEMORANDUM DECISION AND ORDER - 14**

*Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (internal citation and quotation marks omitted).

The Court notes that the "limited exceptions operate to identify and plug holes in the administrative record" and "are narrowly construed and applied." *Id.* Plaintiff contends, and the Court agrees, that the post-decision materials do not fall within any of the stated exceptions allowing consideration. However, Defendants counter that the post-decision ESA consultation – conducted out of an abundance of caution after Plaintiffs submitted the FOIA material with their supplemental notice of intent to sue – did not undermine the Forest Service's existing NEPA analysis. *Defs.' Mem.* at 9, Dkt. 24-1.

In support of their argument that the post-hoc documents should not be considered, Plaintiffs rely on *Western Watersheds Project v. Rosenkrance*, No. 4:09-cv-00298-EJL, 2011 WL 39651, at *7 (D. Idaho Jan. 5, 2011) which held that reliance on "post-hoc rationalizations and after-the-fact studies [on bull trout] do not satisfy NEPA's 'hard look' requirement for the decisionmaker." *Pls.' Mem.* at 7. However, as noted by Defendants, the cited case is inapposite.

In *Western Watersheds*, the BLM had based its Environmental Assessment ("EA") on the mistaken belief that there were no threatened or endangered species on four allotments being considered for grazing permits when, in fact, ESA-listed bull trout were present. Once the mistake was discovered, the BLM conducted a new Biological Assessment ("BA"), determined that there would be no significant impact, obtained a

**MEMORANDUM DECISION AND ORDER - 15**

letter of concurrence, and sought to supplement the record with those documents.  The

court found that the BLM could not cure its "deficient NEPA analysis and circumvent the

public's right to comment on the data upon which the agency uses to reach its decision."

*Western Watersheds Project*, 2011 WL 39651, at *7.  In other words, the court would not

allow supplementation of the record to correct the mistaken assumption upon which the

BLM's decision was based.  Here, however, the post-hoc documents do not reveal a

mistaken assumption in the FEIS but rather confirm the finding that no Canada lynx

occupy the Forest as that term is defined in the Northern Rockies Lynx Management

Direction.  Furthermore, the Forest Service did not seek to alter its NEPA analysis with

new information on the Canada lynx.

　　　Although *Western Watersheds Project* is not on point, given that the post-hoc

documents do not fall within the oft-cited narrowly construed exceptions to the general

rule, the Court will not consider them for purposes of determining whether Defendants

violated NEPA by failing to take a hard look at the effects of the Project on the Canada

lynx.  The Court obviously must consider them for purposes of determining whether the

Forest Service should have prepared an SEIS.

### B.    Hard Look at the Canada Lynx

　　　It is beyond dispute that "NEPA procedures must insure that environmental

information is available to public officials and citizens before decisions are made and

before actions are taken."  *See* 40 C.F.R. § 1500.1(b).  *See also Klamath-Siskiyou*

*Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004).  Plaintiffs

challenge the sufficiency of the Forest Service's analysis on the Canada lynx and assert that information on unverified sightings of Canada lynx on the Forest should have been made available to the public for comment.

### (1)   *Preliminary Matters*

Before addressing Plaintiffs' arguments, the Court must first resolve Plaintiffs' claim that certain documents were not provided.  Plaintiffs note that the 2008 Lynx Hair Snare Survey (FS22038-42), the 2007 Lynx Surveys Final Report (FS22055-60), and the 2010 wildlife specialist report, discussed by Defendants as satisfying their "brief" analysis on the Canada lynx, were not included in the record or NEPA documents.  *Pls.' Reply*  at 2.  In response, the Forest Service claims the documents predated the DEIS and FEIS and were always part of the record.  *Defs. Reply* at 2 (citing FS22038-60).

The Court notes that the wildlife specialist report was not among the items attached to the supplemental notice of intent to sue as having been received only in response to the FOIA request.  For that reason, and based on Defendants' representation that this document has always been in the record, the Court will assume that it was a part of the record.  The Court will also consider the 2007 and 2008 surveys which did not detect Canada lynx because Plaintiffs waived the argument by failing to bring a motion to challenge the record.  *See Scheduling Order*, Dkt. 13 (setting deadline of March 15, 2013 for Plaintiffs to file any motion to challenge the contents of the Administrative Record).

### (2)   *Sufficiency of Analysis*

In contending that the Forest Service did not take a hard look at the impact of the

Project on the Canada lynx, Plaintiffs state:

> The Draft Environmental Impact Statement ("EIS") for the Project contains exactly one sentence referencing Canada lynx, noting only that "Canada lynx is a federally listed threatened species and the U.S. Fish and Wildlife Service ("FWS") has declared the Nez Perce Forest to be unoccupied by lynx; therefore, it will not be discussed further." FS95. The Final EIS merely reiterates that Project impacts to the Canada lynx were not analyzed. FS321, 325. This is the extent of the Forest Service's public disclosure on this threatened species and does not satisfy the agency's obligations under NEPA.

*Pls.' Mem.* at 8.

Plaintiffs claim that "new information" on historical sightings of Canada lynx revealed in the FOIA documents is significant and should have been analyzed. *Pls.' Mem.* at 9-10. They base their historical presence claim on the allegedly new information revealed in the FOIA documents indicating a Canada lynx sighting in the Little Slate area reported by Forest Service personnel in November of 2010, a sighting reported by Forest Service personnel in July of 2006, and several other "apparently reputable sightings" since the 1980s. *Am. Compl.*, ¶ 88; ¶ 89; ¶ 90.

The Forest Service's position is simple. While recognizing that the ESA requirements to examine Project effects on a threatened species are more stringent, it contends its analysis was sufficient under NEPA because Canada lynx do not "occupy" the Forest and therefore the Project will not affect the species. *Defs.' Mem.* at 6; 9. It believes that more comment was unnecessary based on the directives of 40 C.F.R. § 1500.1(b) and § 1502.2(b).

**MEMORANDUM DECISION AND ORDER - 18**

Section 1500.1(b), in relevant part, states that "[m]ost important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."  Section 1502.2(b) provides that "[i]mpacts shall be discussed in proportion to their significance.  There shall be only brief discussion of other than significant issues.  As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted."  The Court notes the further directive that "[e]nvironmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations."  40 C.F.R. § 1502.2(c).

The statement in the FEIS regarding the Canada lynx, while brief, is not as brief as Plaintiffs suggest.  Rather, it contains further detail regarding the basis of the decision not to proceed with further analysis:

> Canada lynx is a federally listed threatened species.  The United States Fish and Wildlife Service (USFWS) has declared the Nez Perce National Forest to be unoccupied by lynx and is secondary habitat (Northern Rockies Lynx Amendment 2007, pg. 3 & 5; USFWS Semi-annual species list 14420-2010-SL-0088 12/30/2009.  The USFWS provided an updated species list by county for the Clearwater and Nez Perce National Forests on August 17, 2011.  Canada lynx is the only threatened and endangered species occurring in Idaho County; however, this is only for the Clearwater National Forest.  As a result, the Nez Perce National Forest is not required to consult with the USFWS regarding effects to Canada lynx from management actions.  Therefore, further analysis regarding Canada lynx and potential effects of the proposed project activities will not be carried forward.

*Little Slate FEIS* at 97 (FS325).

**MEMORANDUM DECISION AND ORDER - 19**

Only *verified* sightings of Canada lynx are relevant when determining whether a

Forest is occupied.  The criteria for verified sightings are set forth in the Northern Rockies

Lynx Management Direction:

> Verified observation or records are those that scientifically
> document a lynx by identifying physical remains, live-captured
> animals, or DNA samples.  Verified records may come from
> the National Lynx Survey, mortality records, photographs,
> research, or surveys.  Verified records must be associated with
> generally reliable sources, such as formal research and survey
> efforts carried out by agencies, tribal governments, or
> universities with appropriate quality control (USDA FS, USDI
> FWS 2006a).

*Northern Rockies Lynx Management Direction*, Ch. 3, Part 1, p. 143 (FS26866).

The sightings to which Plaintiffs refer do not meet the criteria of verified sightings.

Although the unverified sightings may be relevant for ESA purposes, the ESA allegations

were abandoned in the Amended Complaint. Unverified sightings of Canada lynx are

inherently unreliable because bobcats, especially large, pale bobcats, are often confused

with Canada lynx.  (FS26449.)  Inclusion of information on the unverified sightings in the

FEIS would not have triggered an "occupied" status in turn triggering a requirement to do

more than "consider" the Lynx Management Direction that was incorporated into the

Forest Plan.

The Forest Service contends that its finding is supported by the record given that it

surveyed the Forest for Canada lynx in 2007, 2008, and 2009 and did not detect any lynx

(FS22038-42; FS22055-60); that it also analyzed and described potential impact to Canada

lynx habitat in a 2010 wildlife specialist report and related documents (FS19489 (explaining why Canada lynx did not receive further analysis) and FS21851-55 (analyzing habitat acreage)); and that the analysis disclosed potential impacts for each Project alternative and showed that the Project is consistent with the Northern Rockies Lynx Management Direction (FS21738). *Defs.' Mem.* at 7-8.

Plaintiffs contend that the 2010 wildlife specialist report "merely represents the cataloguing of information *in preparation for analysis* in the final EIS that was illegally aborted." *Id.* (citing FS19489 (admitting that "[l]ynx habitat was calculated and acres of lynx habitat treated by alternatives was calculated . . . *but the effects of the alternatives was not analyzed* for the final based on direction from the Forest Wildlife Biologist.") (emphasis in briefing).

The Forest Service counters Plaintiffs' claim that the wildlife specialist's work was a "catalog[] of information" instead of an "actual analysis" with the explanation that the wildlife specialist did complete an "effects analysis" that projected the various alternatives' impacts on lynx habitat and indicated that each of the Project alternatives would be consistent with the Northern Rockies Lynx Management Direction standards. *Id.* (citing FS19489; FS21736-38; *see also* FS21851-55). Finally, the Forest Service maintains that even if it violated the more strict ESA, it still complied with NEPA. *Id.* (citing *Native Ecosystems Council v. Krueger*, 2013 WL 2298183, at *30 (D. Mont. May 24, 2013)).

In *Native Ecosystems Council*, the court noted that "[t]he Forest Service satisfied its

obligation to 'consider' the Lynx Management Direction in planning the Project; as already discussed, it was not required to apply the Direction because the area is unoccupied by lynx." *Id.* The court also noted that the Project E[nvironmental] A[ssessment] and the Wildlife Report considered the Lynx Management Direction and discussed the content of various documents included in the record addressing the lynx and lynx habitat. It particularly noted the emphasis in the Wildlife Report that "the project area is considered unoccupied and that there is little evidence lynx have done more than move through the area in recent years." *Id.* (citations to the record omitted). Finally, the court concluded that "[h]aving adequately considered the Lynx Direction in developing the Project, the Forest Service complied with the Forest Plan and discussed the best available science for maintaining lynx viability." *Id.*

Like the court found in *Native Ecosystems Council*, it appears that the Forest Service here has complied with NEPA. Because the Forest is considered unoccupied by Canada lynx, any impact would have little significance, and the discussion can be permissibly brief. *See* 40 C.F.R. § 1502.2(b) ("there shall be only brief discussion of other than significant issues in an EIS.") Furthermore, in the FEIS, the Forest Service explained and provided citations supporting the fact that the Forest is considered unoccupied by Canada lynx, and it considered the Northern Rockies Lynx Management Direction habitat standards. *See* FS21738 (lynx analysis showing that Project alternatives were consistent with the standards for forest openings, harvest, denning habitat, and lynx movement). There was no other basis for requiring the Forest Service to address unverified lynx

**MEMORANDUM DECISION AND ORDER - 22**

sightings because speculative informative need not be discussed in the EIS.  *McNair*, 537

F.3d at 1001; *New Mexico Cattle Growers v. U.S. Fish & Wildlife Serv.*, No. Civ. 98-367-

M/JHG, 1999 WL 3479509, at *24 (D.N.M. Oct. 28, 1999) (". . . the possibility that

isolated wolves continue to live in Arizona and New Mexico, given that every source

which speaks to the subject considers the wolf extirpated from these regions, is too remote

and speculative to provide the basis of a legal challenge.")  Although the Court is not

bound by *Native Ecosystems Council*, it finds its reasoning persuasive, and Plaintiffs did

not specify any factors overlooked by the wildlife specialist or improperly considered by

her in preparing the 2010 report.

### C.   Need for a Supplemental Environmental Impact Statement

Plaintiffs contend that the Forest Service acted arbitrarily by failing to prepare an

SEIS for public review of the agencies' new lynx analysis, consultation, and decision

documents.  *Pls.' Mem.* at 9.

Agencies are required to prepare an SEIS if:

> (i) The Agency makes substantial changes in the proposed
> action that are relevant to environmental concerns; or (ii)
> There are significant new circumstances or information
> relevant to environmental concerns and bearing on the
> proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1).

As noted by the Forest Service, the Ninth Circuit has held that a court can consider

post-decisional documents or surveys in evaluating Plaintiffs' demand for a supplemental

EIS:

**MEMORANDUM DECISION AND ORDER - 23**

> An action to compel an agency to prepare [a supplemental
> EIS] . . . is not a challenge to a final agency decision, but
> rather an action . . . to compel agency action unlawfully
> withheld or unreasonably delayed.  In such cases, review is not
> limited to the record as it existed at any single point in time,
> because there is no final agency action to demarcate the limits
> of the record.

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (internal

quotation marks and citation omitted).

It was only out of an abundance of caution that the Forest Service decided to

consult with FWS to ensure compliance with the ESA.  *Defs.' Mem*. at 9.  The consultation

was not initiated based on new information about the lynx.  The FWS concurrence letter of

February 11, 2013, concluded that the Project was not likely to adversely affect the

Canada lynx and that lynx critical habitat is not present on the Forest.  (FS6897.)  It also

found that despite some anecdotal sightings as recent as 2010 and pre-1999 trapping

records suggesting transient lynx are occasionally present on the Forest, the likelihood that

a transient lynx would be present during the project implementation is very low, that there

is sufficient adjacent habitat available for lynx to avoid the area, and that lynx are

generally tolerant of human presence and activities.  (FS6899.)

The consultation did not identify any verified lynx sightings or indicate that there

would be "significant impacts" requiring supplemental NEPA analysis.  New surveys in

February and March, 2013, conducted as part of the consultation process yielded no

Canada lynx.  *Defs.' Mem*. at 9.  Because the surveys and consultations confirmed that

Canada lynx do not occupy the Forest, although they may be present transiently,

**MEMORANDUM DECISION AND ORDER - 24**

Defendants maintain that there was no duty to prepare an SEIS.  The Court agrees.

"[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *Marsh*, 490 U.S. at 370.  "To require otherwise would render agency decision-making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Id.*  It follows, then, that an SEIS would not be required where *no* new information comes to light.

Here, the Forest Service has not made any changes, much less substantial changes, in the proposed Little Slate Project.  There are no new circumstances or information, much less significant new circumstances or information, relevant to environmental concerns or bearing on the proposed action or its impacts.  The unverified sightings discussed in the documents were known to the Forest Service at the time it prepared the DEIS and FEIS.

As stated above, for NEPA purposes, whether lynx "may be present" on the Forest is irrelevant.  Whether lynx "may be present" is relevant only in the context of the ESA. Unverified sightings of lynx are not required to be included in an EIS in order to comply with NEPA. *See Native Ecosystems Council*, 2013 WL 2298183 at *30 (finding an ESA violation did not amount to a NEPA violation because the ESA's "may be present" standard was "much broader" than NEPA's "occupied" standard.").  Therefore, even if the unverified sightings were first discovered in ESA consultation process, there would be no need for an SEIS.  As Defendants' argued in their Reply, "there is no support for this attempt to link NEPA and ESA requirements, especially because Plaintiffs dismissed their lynx-based ESA claim." *Defs.' Reply* at 3.  Accordingly, the Court cannot find that an

**MEMORANDUM DECISION AND ORDER - 25**

SEIS is triggered by reports of unverified sightings, particularly when later surveys did not reveal evidence that lynx may be present.

**2.     The Forest Service's Alleged Violation of NFMA and NEPA by Failing to Ensure the Viability of Old-growth Dependent and Snag Dependent Species[6]**

Plaintiffs contend that the Forest Service is violating NFMA by not meeting its obligations under the Nez Perce Forest Plan which requires it to (1) manage old-growth habitat to maintain viable populations of old-growth dependent species, and (2) monitor population levels of Management Indicator Species ("indicator species"). *Pls.' Mem.* at 10.  Plaintiffs cite to FS2483, entitled Chapter II, Forestwide Management Direction, which states that "[v]iable populations of old-growth-dependent species will be maintained."  They also cite FS2591, entitled Chapter V, Implementation, Table V-1, Forest Plan Monitoring Requirements, which provides for monitoring population trends of indicator species – wildlife and fish – in accordance with 36 C.F.R. 219.19(6).  The Northern goshawk, fisher, and pileated woodpecker were selected as indicator species for old growth and old forest dependent species, and the pileated woodpecker was selected for snag dependent species as well.[7]  (FS322-23.)

_____

[6] The Nez Perce Forest Plan is included in the Administrative Record.  *See* FS2474-2647.  The Plan Appendices and Amendments are likewise included.  *See* FS2670-2730 and FS2731-2956, respectively.

[7] The primary habitat for each of these species is described as follows:

 *Northern Goshawk*: "Mature to old growth, closed canopy forests for nesting.  Pole stage or larger stands with open understories for foraging.  May also forage along forest edges."  (FS322.)

 *Fisher*:  "Diverse, moist, mature forests at low to moderate elevations, with high canopy cover, often along riparian areas, and abundant large diameter woody debris."  (FS322.)

**MEMORANDUM DECISION AND ORDER - 26**

The Forest Service, noting that the Project does not involve any old-growth logging, contends that it fully assessed the Project's impact on these species under NFMA and NEPA. *Defs.' Mem.* at 10-11. The Forest Service asserts further that because the provisions cited by Plaintiffs apply to "planning level" as opposed to "project level" standards,[8] there was no duty to assess the viability of management indicator species by population trend data. *Id.* at 11.

According to the Forest Service, there are three Forest Plan provisions that address requirements for old-growth and snag-dependent species:

1.  "Maintain viable populations of existing native and desirable non-native vertebrate wildlife species" (FS2495);

2.  "Monitor population levels of all Management Indicator Species on the Forest" (FS2495); and

3.  "Provide management for minimum viable populations of old-growth and snag-dependent species by adhering to the standards stated in Appendix N [of the Forest Plan]" (FS2496).

*Defs.' Mem.* at 11.

Of these three relevant provisions, the Forest Service claims that only the third provision (meeting the Appendix N standards) applies to the project level, and that it has

---

*Pileated woodpecker*: "Nest in mature forests with high canopy closure, decadence, and multilayered structure. Forages on stumps, trees and logs with abundant ant populations. Will use habitats with small to large trees/snags for foraging." (FS323.)

[8] "NFMA and its implementing regulations provide for forest planning and management at two levels: the forest level and at the individual project level. At the forest level, the agency develops a forest plan, which is a broad, long-term planning document for an administrative unit of the National Forest System. A forest plan establishes goals and objectives for management of forest resources. . . . At the project level, site-specific projects must be consistent with the applicable forest plan." *Earth Island Institute v. U.S. Forest Service*, 697 F.3d 1010, 1014 (9th Cir. 2012) (internal citations omitted).

**MEMORANDUM DECISION AND ORDER - 27**

complied with all of the requirements of Appendix N (FS2707-09).  *Id*.

> **A.   Alleged NFMA Violations**
>
> **(1)   *Management of Old Growth Habitat***

Appendix N directs that "in order to maintain a viable population of old-growth-dependent species, it is necessary to maintain 10 percent of the total forested acres as old growth with no less than 5 percent of the forested acres maintained as old growth within each prescription watershed or combination of watersheds totalling (sic) 5,000 to 10,000 acres."  (FS2708.)  Appendix N also requires the Forest Service to "[v]erify the quality, amount, and distribution of existing and replacement old-growth habitat *as part of project planning*."  (FS2708 (emphasis added).)  The Forest Service interprets these provisions to mean that the Forest Service must examine a project area for compliance with its old-growth targets.  *Defs.' Mem.* at 12.  It also notes that Appendix N essentially directs the Forest Service to use the proxy-on-proxy approach of monitoring on the project level regardless of whether indicator species are present in the project area or not.  *Pls.' Reply* at 6.

It appears from the FEIS that the Forest Service used a variety of methods for identifying old growth in the Project area such as "Forest Service databases, aerial photo interpretation, field reconnaissance, GIS mapping, data tables, and analyses of satellite imagery, Vmap 2006 dataset; 2008 LiDAR (Light Detection and Ranging optical remote sensing technology), stand exams (2007-2009), Slate Creek Ecosystem Analysis at the Watershed Scale (USDA 2003a), data and FS R-1 satellite imagery land classification

**MEMORANDUM DECISION AND ORDER - 28**

(R1_SILC) dataset with area specific refinements. . . ."  (FS324.)

The Project area encompasses Old Growth Analysis Units (OGAUs) 203 and 206 which  "were used to analyze direct, indirect, and cumulative effects of the project and to assess compliance with Forest Plan standards (Appendix N)."  (FS348.)  Each OGAU exceeds the Forest Plan old growth standard of greater than 5% (8% and 13%, respectively) and the Forest Plan total old growth and replacement old growth standard of greater than 10% (19% and 20%, respectively).  (FS349; 599.)  Therefore, the Project exceeds Appendix N's requirements because the Project does not include harvesting of any old growth habitat.  (FS 595.)  Indeed, even if the old growth totals were less than the required 10%, because the Project will not reduce the old growth habitat, the Forest Service would not be in violation of NFMA.  Plaintiffs do not appear to challenge the Forest Service's assertion that it has complied with the Appendix N project level standard.

### (2)   *Monitoring of Management Indicator Species*

Plaintiffs proceed to discuss the Ninth Circuit approved practice of using a "proxy-on-proxy" monitoring approach which allows for monitoring habitat as proxy for monitoring indicator species.[9]  *Pls.' Mem.* at 10.  However, they question the reliability of that approach when an indicator species is absent from the area.  *Id.* at 10-11.  Plaintiffs criticize the Forest Service's reliance on the proxy-on-proxy approach in the absence of

---

[9]  The proxy-on-proxy approach involves using habitat as a proxy to measure a species' population and then using that population as a proxy for the population of other species.  *Lands Council v. McNair*, 537 F.3d 981, 997 n.10 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008).

recent documentation of the presence or nesting/denning of the indicator species in the Project area. *Id.* at 11. Plaintiff contends that the approach fails to "mirror reality" and thus violates NFMA. *Id.*

Plaintiffs also criticize the Forest Service's alleged heavy reliance upon the 2006 Samson publication to satisfy its obligation to monitor indicator species population trends. Plaintiffs assert Samson is predictive only, and claim that the Forest Service cannot use it to satisfy its burden to show that population trends are actually increasing. *Id.* at 12. Plaintiffs conclude that the Forest Service has acted arbitrarily in determining that the Project will have no or minimal impacts on these species given that (1) goshawks "appear to be virtually nonexistent in the Project area," (2) fishers "appear to be absent from the Project area," (3) pileated woodpecker documentation for the Project area has not been disclosed, and (4) the Forest Service's admission that the Project logging will degrade habitat for these species after which it will take 100-150 years for habitat to redevelop. *Id.* at 12-14.

Plaintiffs appear to argue that monitoring is required at the project level, but also argue that the Forest Service is failing to meet the monitoring requirement on the Forest level as well. However, they may have dropped the project-level requirement argument in their Reply. Plaintiffs state, "To be clear, Plaintiffs argue that (1) population trend monitoring is, at a minimum, a Forest-level requirement that the Forest Service has not met, and is not excused from meeting, in violation of NFMA because (2) the evidence in the record suggests that the indicator species are no longer present in "suitable" habitat in

the Project area." *Pls.' Reply* at 8.  The Forest Service replies that the fact that a Forest

Plan contains monitoring goals does not mean achievement of those goals is a prerequisite

to approval of an individual project.  *Defs.' Reply* at 9 (citing *Forest Guardians v. U.S.*

*Forest Serv.*, 641 F.3d 423, 444 (10th Cir. 2011)).  This will be discussed in more detail

below.

       The Court need not determine whether the proxy-on-proxy method is an acceptable

method of monitoring population trends *unless* it first determines that the viability and

monitoring requirements apply on the project level. *See Earth Island Institute v. U.S.*

*Forest Serv.*, 697 F.3d 1010, 1116 (9th Cir. 2012) ("Proxy-on-proxy" analysis is not

required absent a project-level requirement).

       The Forest Service claims that Plaintiffs are relying on  "a defunct 1982

regulation," 36 C.F.R. § 219.19, in advancing their viability and monitoring arguments.

*Id*. at 12.  The 1982 Rule "require[d] the Forest Service to identify and monitor

management indicator species ('MIS') and direct[ed] that 'fish and wildlife habitat shall be

managed to maintain viable populations of existing native and desired non-native

vertebrate species.'"  *Ecology Center v. Castaneda*, 574 F.3d 652, 657 (9th Cir. 2009)

(quoting  47 Fed. Reg. 43048 (September 30, 1982)).  The 1982 Rule was interpreted to

apply at the project level but was  "partially superseded" by the 2000 Rule, and "[t]he

requirements of the superceded 1982 Rule apply only to the extent they were incorporated

into the [relevant] Forest Plan."  *Id*.  In fact, the requirements of the 1982 Rule must have

been "clearly" incorporated in the Plan to be considered a binding agency regulation.  *See*

**MEMORANDUM DECISION AND ORDER - 31**

*Earth Island Institute*, 697 F.3d at 1014 (citing *Earth Island Institute v. Carlton*, 626 F.3d 462,  470-71 (9th Cir. 2010)). The question here then becomes whether the requirements of the 1982 Rule were clearly incorporated into the Nez Perce Forest Plan thus making its viability and monitoring requirements applicable at the project level.

A review of Chapter II of the Forest Plan, Forestwide Management Direction, Wildlife and Fish, appearing at FS2495, reveals that the goshawk, fisher, and pileated woodpecker are not among the species listed under the section addressing maintaining viable populations of existing native and desirable non-native vertebrate wildlife species. (FS2495.)  However, they are all listed under the section directing monitoring of population levels of all Management Indicator Species on the Forest.  *Id.*  There is no reference in this section of the 1982 Rule requirements with respect to project level activities.  Indeed, the section is entitled *Forestwide* Management Direction.  (FS2495 (emphasis added)).  It states that population levels will be monitored and evaluated as described in the Forest Plan Monitoring Requirements (Chapter V of the Forest Plan).  *Id.* Chapter V, in turn, refers to monitoring items applicable to specific management areas, the requirements for which are contained in Appendix O.  (FS2589.)  It specifically states "[o]ther monitoring items are more applicable to broad areas or are Forestwide in nature . . . [and] are listed in Table V-1.  *Id.*  Among the Table V-1 items to be monitored on a Forestwide basis is "Population trends of indicator species – wildlife and fish" which are to be conducted every 3-5 years.  (FS2591.)  In contrast, Appendix N specifically calls for a proxy-on-proxy approach and further states that the Forest Service is to "[v]erify the

quality, amount, and distribution of existing and replacement old-growth habitat as a part of *project* planning."  Appendix N-2 (emphasis added) (FS2708.)  It contains the same directive for snags.  Appendix N-3 (FS2709.)

Absent clear indication that the Forest Plan incorporated the 1982 Rule on the project level, the Court must find it did not.  Furthermore, not only is the Forest Service's interpretation of its Forest Plan entitled to deference generally, its interpretation of any ambiguity regarding whether the 1982 Rule has been incorporated into its Forest Plan is also entitled to deference.  *Earth Island Institute*, 697 F.3d at 1018 (citations omitted).  Accordingly, the Court finds that the Forest Service has complied with the Forest Plan and NFMA.

### B.    NEPA and Hard Look at Project Impacts on Management Indicator Species

The Forest Service contends that it has complied with NEPA by ensuring that the Project is consistent with the Forest Plan and by conducting "extensive analysis regarding Management Indicator Species in the Forest, including the goshawk, fisher, and pileated woodpecker."  *Defs'. Mem.* at 14.

The Forest Service recognized that even though the Project would not impact old-growth areas, it would reduce the habitat in other areas for the named species while noting that those reductions would be relatively minor in light of the Project's benefits.  *Id.*  For example, it found that reductions of the fisher's summer habitat by 4% and winter habitat by 7% would be counterbalanced by benefits in prey diversity and fire control.  *Id.* (citing

**MEMORANDUM DECISION AND ORDER - 33**

FS331).  Further, it found that the timber harvest would reduce goshawk foraging habitat by 6% but that there would be no effects from trail construction or watershed restoration. *Id*. (citing FS341-42).  Finally, it found that the timber harvest would reduce pileated woodpecker nesting habitat by 6% and foraging habitat by 5%.  *Id*. (citing FS344).  On the other hand, it found that the Project should improve habitat for these species in the future, that the Project contains mitigating measures to protect old-growth and snag habitat, and that the impact on the fisher would be reduced because the Project includes buffers around streams.  *Id*. at 15 (citing FS331; 344; 330).

In completing its analysis, the Forest Service considered (1) the 2004 Forest Plan Monitoring Report indicating stable population trends for the three species (FS4467-73), (2) the 2006 Samson study indicating that the goshawk and pileated woodpecker had more than sufficient habitat in the region in which the Forest is located (FS325), and (3) more recent goshawk and pileated woodpecker sightings in the Forest (FS341, 343, 21540-79).

The Forest Service's conclusion that the Forest has viable populations of these species such that the Project's minimal effects on these species will not threaten their existence in the Forest was reasonable.  (FS332; 343-45.)  Plaintiffs have cited no authority for the fact that the Forest Service lacks funds to complete the recommended planning level monitoring should prevent project approval. *See Def.'s Reply* at 7. To the extent that Plaintiffs contend that non-compliance with monitoring requirements at the Forest level prevents approval at the project level, the Court rejects the argument. Accordingly, the Court finds that the Forest Service did not act arbitrarily or capriciously

**MEMORANDUM DECISION AND ORDER - 34**

in analyzing the Project's effects on Management Indicator Species.

**3.     The Forest Service's Alleged Violation of NEPA by Failing to Disclose and Take a Hard Look at Project Impacts on Roadless Characteristics and Wilderness Potential.**

Plaintiffs contend that the Forest Service violated NEPA by failing to sufficiently analyze and disclose the "true consequences" of the Project activities on roadless characteristics and wilderness potential. *Pls.' Mem.* at 15. Plaintiffs specifically refer to the fact that the Forest Service has authorized logging and road building activities in two unroaded areas, the Little-Rubie unroaded area and the Big Boulder Creek unroaded area, both of which are part of the Gospel Hump Wilderness roadless expanse. *Id.* (citing FS250). They question the Forest Service's conclusion that there will be no impact on roadless characteristics and wilderness potential despite the fact that the logging may last up to 15 years and require construction of approximately three miles of roads in the unroaded areas. *Id.* at 16.

The Forest Service's position that the roads will be removed and the trees will grow back does not satisfy Plaintiffs. *Id.* Rather, they conclude that the Forest Service's failure to discuss how the impact from regeneration logging of over 500 acres of unroaded land will be managed and its impact on roadless character and wilderness potential "does not constitute a 'full and fair discussion of the potential effects of the project' as required by NEPA" and is inconsistent with its discussion of impacts from regeneration logging in other areas of the Project record. *Id.* at 17-18. It further characterizes the Forest Service's analysis as "dishonest." *Id.* Plaintiffs admit that the EIS contains an analysis on roadless

**MEMORANDUM DECISION AND ORDER - 35**

character but finds its analysis on impacts from regeneration logging and roadbuilding to be deficient. *Id*. at 18 (citing *Lands Council v. Martin*, 529 F.3d 1219, 1231-32 (9th Cir. 2008).

The Forest Service asserts that Plaintiffs cannot support a NEPA claim just because they disagree with the Forest Service's conclusion. *Defs.' Mem.* at 16. It further claims that its conclusions were based on its experts' analyses and that the EIS disclosed and considered the impacts on (1) designated wilderness, (2) Idaho Roadless Areas, and (3) unroaded areas. *Id*. (citing FS366-70). The Forest Service notes that Plaintiffs do not appear to challenge the disclosures and analyses regarding (1) the Project area adjacent to a boundary of the Gospel-Hump Wilderness, (2) the restoration activities on the road that bisects the two Idaho Roadless Areas in the Project area, and (3) its conclusion that "[r]emoval of [other] roads w[ill] enhance the roadless characteristics" of one of the areas and "connect it with other unroaded lands." *Id*. at 17. Plaintiffs do, however, challenge the Forest Service's analysis pertaining to unroaded areas where it intends to engage in logging and temporary road construction in the Little Rubie Unroaded Area and the Boulder Creek Unroaded Area. *Id*. (citing (FS369)).

The Forest Service responds that four pages of the FEIS disclosed and considered the impacts on designated wilderness, Idaho Roadless Areas, and unroaded areas. *Id*. at 18 (citing FS366-370). Specifically with regard to unroaded areas, it referred to its discussion that the logging and temporary road construction in these areas will be implemented in ways that will have minimal impact although there would be some longer term "visual

**MEMORANDUM DECISION AND ORDER - 36**

effects." *Id.* (citing FS370-71)

The Forest Service also notes that Plaintiffs' challenge omits certain key points such as (1) the fact that the Forest Plan permits logging, road construction, and motorized recreation in unroaded areas (FS356; 367; and 2541); (2) that the Project will affect only 5% of the unroaded areas and the roads will be decommissioned within three years of construction (FS369; 585);[10] (3) that the logging will take place next to areas with past logging which will minimize the overall visual impact from the Project (FS369; 721; and 17424); (4) that the potential for wilderness designation is already low because of past activities (FS368; 369-71; and 18187); and (5) that the Project will improve the natural character of the Little Rubie and Boulder Creek Unroaded Areas (FS369). *Id.* at 17-18.

Plaintiffs rely in part on the cases of *Lands Council v. Martin* and *Smith v. United States Forest Service*, 33 F.3d 1072 (9th Cir. 1994) to support its claim. However, the cases merely stand for the proposition that logging is "environmentally significant" and "its environmental consequences must be considered" when considering logging in roadless area – not that logging and temporary roadbuilding are not permitted in potential wilderness areas.

The plaintiffs in *Lands Council v. Martin* argued that the EIS violated NEPA because it did not contain sufficient discussion regarding the effects of proposed logging

---

[10]   According to the FEIS, the total number of acres in the Little Rubie and Boulder Creek Unroaded Areas for which vegetative treatment is planned comprises only 5% of the total 9,900 acres of unroaded area.  (FS369.)

**MEMORANDUM DECISION AND ORDER - 37**

on the roadless character of the subject roadless areas specifically with regard to its

wilderness designation potential. The Ninth Circuit reiterated its position enunciated in

*Smith* as to why environmental consequences of logging in roadless areas must be

considered:

> First, roadless areas have certain attributes that must be
> analyzed.  Those attributes, such as water resources, soils,
> wildlife habitat, and recreation opportunities, possess
> independent environmental significance.  Second, roadless
> areas are significant because of their potential for designation
> as wilderness areas under the Wilderness Act of 1964.

*Lands Council*, 529 F.3d at 1230.

The Ninth Circuit then examined *Smith* in light of the defendant's contention that

discussion of potential for wilderness designation was not required because the roadless

areas at issue were uninventoried and were less than the 5,000 acres at issue in *Smith*.  *Id.*

The Ninth Circuit concluded that such characteristics "[d]id not provide a meaningful

legal distinction from the roadless area in *Smith*" given that the Wilderness Act does not

require a minimum of 5,000 acres for wilderness designation.  *Id*. at 1230-31.  It then

clarified that "the rule in *Smith* applies to roadless areas that are *either* greater than 5,000

acres *or* of a 'sufficient size' within the meaning of 16 U.S.C. § 1131(c)."  *Id*. at 1231

(emphasis in original).  The analysis in the EIS in *Lands Council* was based on the

erroneous assumption that *Smith* applied only to roadless areas of at least 5,000.  There is

no such error here.

Indeed, as the Forest Service notes, the District of Montana rejected a nearly

**MEMORANDUM DECISION AND ORDER - 38**

identical NEPA claim brought by one of the Plaintiffs in this case.  *Defs.' Reply* at 9.  In

*Alliance for the Wild Rockies v. Krueger*, 2013 WL 3187275, at *17 (D. Mont. June 25,

2013), the court rejected AWR's *Lands Council* and *Smith*-based NEPA challenge to the

Forest Service's conclusion that the impacts from logging in a roadless area would not

cause irreversible damage.[11]  The fact that the impacts might last for 15-25 years did not

affect the court's decision.  It noted that there is no case law support for AWR's position

that logging or temporary road construction is prohibited in roadless areas or areas that

might some day be designated wilderness.  *Id*.  It concluded that

> . . . as the Service explained, the impacts are temporary and
> would no longer be evident over time.  The plaintiffs have not
> shown that the Service "offered an explanation that runs
> counter to the evidence before the agency or is so implausible
> that it could not be ascribed to a difference in view or the
> product of agency expertise."

*Id*. (citing *Lands Council v. Martin*, 529 F.3d 1219, 1230 (9th Cir. 2008)).  While certainly

not binding on this Court, the reasons and conclusions reached by the Montana district

court are persuasive.  The Court finds that Defendants have taken the requisite hard look at

the project's impact on roadless characteristics and wilderness.

---

[11]  At oral argument, Plaintiffs' counsel indicated that this case may be appealed.  A check of the
docket in the District of Montana indicates that Defendants filed a Motion to Alter or Amend Judgment
on the two issues decided adversely to them that is still pending before the district court.  *See* District of
Montana Case No. 9:12-cv-00055-DLC, Dkt. 46.

**MEMORANDUM DECISION AND ORDER - 39**

4.    **The Forest Service's and FWS's Alleged Violations of the ESA and NEPA by Failing to Take a Hard Look at Project Impacts on Bull Trout, Failing to Ensure Bull Trout Survival and Recovery, and Failing to Ensure No Adverse Modification of its Critical Habitat.**

Bull trout is a threatened species under the ESA, and there is designated bull trout critical habitat in the Project area.  (FS759; 761.)  The  FWS found that, at most, the Project would affect only 1.27 miles of nearly 20,000 miles of critical bull trout habitat. (FS754; 766-69; 774.)

Plaintiffs claim that in view of the facts that the bull trout population in the Project area "is at high risk of extirpation," "the short-term population trend [is] unknown, numbers of bull trout are low (50-250)," "threats to the population are substantial and imminent," and Project activities are likely to exacerbate adverse habitat conditions for the bull trout, the Agencies acted arbitrarily and capriciously under the ESA and NEPA by (1) failing to adequately discuss and analyze the direct, indirect, and cumulative impacts of logging, road building, and other management activities on the bull trout and its habitat, and (2) failing to use the best available science in making its determinations of "no jeopardy" and "no adverse modification" for the bull trout.  *Pls.' Mem.* at 18-19.

Plaintiffs claim that the Project will affect the Columbia River distinct population segment of the bull trout species within the Salmon River Management Unit and the Little-Lower Salmon River core area.  *Id*. (citing FS750).  They further claim that the survival and recovery of each individual core area within each management unit "is critical to the persistence of management units and to the recovery of the Columbia River population

segment." *Id.* at 19 (citing FS747-50).

**A.      Failure to Adequately Analyze Direct, Indirect, and Cumulative Effects in Violation of the ESA and NEPA**

In addition to citing the factors pertaining to bull trout and habitat mentioned above, Plaintiffs additionally claim that the bull trout streams in the Project area have "cobble embeddedness, a measure of suspended sediment" and fail to meet Forest Plan standards. *Id.* at 20.  The Court notes that Plaintiffs misconstrue the term "cobble embeddedness."  It is not a measure of suspended sediment.  Rather, it is fine sediment embedded in rocks at the stream bottom.  *See* FS312.

Plaintiffs also claim that Defendants should have determined the "tipping point precluding recovery" of the bull trout and whether or when it will be reached as a result of Project activities.  *Pls.' Mem.* at 21.

**(1)      *Preliminary Matters***

To place the ESA portion of the claim in context, it is necessary to discuss the duties that ESA section 7(a)(2) and its implementing regulations impose on the Agencies. Section (a)(2) mandates inter-agency consultation regarding actions that may affect endangered or threatened species.  As recently explained by the Ninth Circuit,

> Substantively, section 7(a)(2) requires federal agencies, such as the Forest Service, to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). Procedurally, before initiating any action in an area that contains threatened or endangered species, federal

**MEMORANDUM DECISION AND ORDER - 41**

agencies must consult with the FWS (for land-based species)
or the National Marine Fisheries Service (for marine species)
to determine the likely effects of any proposed action on
species and their critical habitat. The ESA and its
implementing regulations establish a framework for such
inter-agency consultation. The agency proposing the action
(action agency)—in this case, the Forest Service—must
independently determine whether the action "may affect" a
listed species or its habitat under the ESA. 50 C.F.R. §
402.14(a). If the answer is yes, "formal consultation" with the
appropriate consulting agency is generally mandatory. 50
C.F.R. §§ 402.14(a)–(c). . . .  In formal consultation, the
consulting agency must prepare a biological opinion that
advises the action agency as to whether the proposed action,
alone or "taken together with cumulative effects, is likely to
jeopardize the continued existence of listed species or result in
the destruction or adverse modification of critical habitat." 50
C.F.R. § 402.14(g)(4).

*Conservation Congress*, 720 F.3d at 1051 (citations omitted).

Here, the Forest Service engaged in the mandated consultation with FWS,

conducted a Biological Assessment (FS792-890) and determined that the Project was

"likely to adversely affect" the bull trout, and formally consulted with FWS.  FWS then

prepared the mandated Biological Opinion ("BiOp") (FS728-791) advising the Forest

Service that the proposed action "would not jeopardize the coterminous population of bull

trout" and would "not impact the functionality of critical habitat in the action area . . . ."[12]

(FS772.)   The FWS further imposed reporting and monitoring conditions and

conservation recommendations with respect to the impacts of any incidental take.  (FS777-

---

[12]  "The ESA defines 'critical habitat' for a threatened or endangered species to mean areas that
are 'essential to' or 'essential for' the species' conservation."  *Conservation Congress*, 720 F.3d at 1051
(citing 16 U.S.C. §§ 1532(5)(A)(i), (ii)).

**MEMORANDUM DECISION AND ORDER - 42**

78.)  At issue here is whether the consultation and BiOp were sufficient.

At the outset, the Court notes the Forest Service's contention that Plaintiffs appear to assert ESA claims against the Forest Service.  *Defs.' Mem*. at 20 n.12.  As the Forest Service states, it meets its ESA duties by reasonably relying on FWS's BiOp.  *Id*. (citing *Pyramid Lake Pauite Tribe of Indians v. U.S. Dept. of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990)).  In response to that assertion, Plaintiffs emphasize that the Forest Service nevertheless had an ongoing obligation to provide data to FWS.  *Pls.' Reply* at 10.  However, Plaintiffs do not identify any new information that was not considered by the FWS at the time it prepared is BiOp.  *See Aluminum Co. of Am. v. Bonneville Power Admin*., 175 F.3d 1156, 1161 (9th Cir. 1999) ( "action agency" not required to conduct an independent analysis when evidence and arguments have already been considered by the consulting agency).  Accordingly, no cause of action under the ESA lies against the Forest Service.

The Court next notes that in their Reply, Plaintiffs fault the FWS's use of a surrogate in the Incidental Take Statement.  *Pls.' Reply* at 13.  Defendants contend that this argument is subject to dismissal for failure to raise the claim in their Notices of Intent to Sue under the ESA or in the Amended Complaint.  *Defs.' Reply* at 12.  The Court agrees.

The Ninth Circuit has made clear that where a notice of intent to sue does not raise a particular issue with the result that "neither party was able to resolve that particular grievance in the litigation-free window provided for under the ESA notice provision," the

district court must dismiss the claim for lack of subject matter jurisdiction.  *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 521 (9th Cir. 1998).  "At a minimum . . . [a plaintiff] [is] obligated to provide sufficient information of a violation so that the Secretary [of the Interior] or [United States Bureau of] Reclamation [can] identify and attempt to abate the violation."  *Id.* at 522.  Accordingly, because Plaintiffs did not raise it earlier, Plaintiffs' claim regarding FWS's use of a surrogate is dismissed for lack of jurisdiction.

(2)    *Primary Arguments*

(a)    *Failure to Take a Hard Look*

Plaintiffs contend that Defendants violated NEPA and the ESA by focusing almost entirely on short-term impacts from in-stream restoration activities and not the effects of the proposed 15 years of logging and logging truck haul traffic among other things. Plaintiffs also contend that compounding the Agencies' deficient impact analysis is the Forest Service's "treatment of other current and reasonably foreseeable future actions which, when considered in conjunction with the Little Slate Project, may have a significant negative effect on fish habitat."  *Pls.' Mem.* at 23-24.  In other words, it failed to consider the cumulative environmental effect of the Project as required by NEPA.

As stated above, Plaintiffs bring this claim under both NEPA and the ESA. To the extent that Plaintiffs allege that Defendants violated the ESA by failing to consider cumulative effects, their claim must fail.  Under the ESA, "cumulative effects" are defined as "those effects of *future State* or *private activities*, not involving Federal activities, that

**MEMORANDUM DECISION AND ORDER - 44**

are reasonably certain to occur *within the action area* of the Federal action subject to consultation." *Conservation Congress*, 720 F.3d at 1054 (citing 50 C.F.R. § 402.02 (emphasis added)). The definition only pertains to ESA section 7 analyses and differs from the broader meaning of "cumulative impact" under NEPA. *Id*. at 1055. Plaintiffs have not alleged any State or private activities at all much less any that are reasonably certain to occur.

"Cumulative impact" in the NEPA context means "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non Federal) or person undertakes such actions." *Id*. (citing 40 C.F.R.§ 1508.7 and *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1183 (9th Cir. 2011)). "In sum, the terms 'cumulative effects,' 'cumulative impact,' and 'environmental baseline' have distinct regulatory meanings under the ESA and NEPA." *Id*.

As Plaintiffs claim, most of the discussion focuses on instream and restoration work, but both the Forest Service and FWS engaged in considerable discussion of logging and vegetation treatments and other Forest activities.

**Forest Service's Biological Assessment**

The Forest Service Biological Assessment examined the effects of the proposed action. It noted that the goal of the proposed action was to improve aquatic conditions and habitat through restoration of instream and upland areas. (FS794.) The Biological Assessment concluded that various aspects of the project would likely adversely affect bull

trout and their habitat in the short-term only due to increased sediment and increased

turbidity which would lessen over time.  (FS824.)  The Biological Assessment addressed

the effects of the Project on the bull trout and the potential effects on bull trout habitat.

(FS818-21.)  It also discussed the fact that very little of the land within the Little Slate

project area is owned privately, described the mining claims and the resultant minimal

affects on bull trout habitat due to the need for authorization from the Forest Service to

engage in any significant surface disturbing activities, and discussed the temporary nature

of any adverse effects coupled with the overall long-term improvement of habitat.

(FS824.)  It concluded that the effects of the Little Slate Creek Project on fish bearing

streams downstream of the analysis area would "be negligible and thereby insignificant,

and will not lead to cumulatively significant impacts when other Federal or State and

private actions are considered."  (FS824.)

**FWS's Biological Opinion**

The BiOp addressed the status of the bull trout in the area and the factors affecting

it.  (FS759-61.) It addressed the same for bull trout habitat.  (FS761.)  It then turned to the

direct and indirect effects on the bull trout and on its habitat, including the sediment

effects, block-netting and fish salvage effects, beneficial effects, and the effects of

interrelated or independent actions.  (FS762-69.)  It noted that FWS was "not expecting

significant effects to bull trout from vegetation treatments or other project activities due to

the Conservation Measures and BMPs incorporated into the project or due to the absence

of bull trout."  (FS762.)  It further noted that "[t]he Forest uses NEZSED and FISHSED to

model changes in sediment yield and changes to fish habitat quality (in terms of cobble embeddedness) resulting from road construction and timber harvest."  (FS762.)  Finally, it considered the cumulative effects of the Project on the bull trout and its habitat.  (FS769-72.)  The FWS determined that the probability of cumulative effects occurring from non-federal action was low because of the small percentage of privately owned land ("less than 1 percent of the Rubie Creek watershed, and 0.10 of a percent of the project's analysis area acreage within the Little Slate Creek drainage").  (FS770.)  It determined that mining is not considered a cumulative effect because the mine claimants do not have surface rights and any significant surface disturbing activity would have to be preauthorized.  (FS770.)  It identified illegal and inadvertent harvest of bull trout and global climate change as cumulative effects.  The FWS concluded that except for climate change, cumulative effects would not "appreciably alter the existing baseline condition of the action area during the lifetime of the project."  (FS770-71.)  It then determined the "quite certain" warming of the global climate would have negative effects on bull trout habitat.  (FS771.)

Based on its studies and review, the FWS concluded that the Project would have only short-term effects on the bull trout and its habitat that would be minimized by the conservation measures and best management practices incorporated into the Project and found that the action "will not jeopardize the coterminous population of bull trout" or "impact the functionality of critical habitat."  (FS772.)  Among those factors, the FWS considered the Forest Service's strategies for minimizing any negative effect including safeguards such as nets to prevent bull trout from entering work sites, the long-term

benefits of eliminating roads and trails with the resultant decrease in "chronic sediment sources," improving "streamside riparian vegetation," and restoring "subsurface water connectivity.  (FS766-69.)

Among other factors cited by the FWS, it found that at most, the Project would affect only 1.27 miles of nearly 20,000 miles of critical bull trout habitat in its range with increased sediment concentrations (FS754; 766-69; 774), that the effects will be localized and short-term or of low intensity and short duration in part due to performing the work only during low flow periods (FS764-65), that observation of other instream work showed that streams recover from elevated sediment levels during high flow events the following spring (FS763-65), that its modeling of changes in stream quality predicted no changes to fish habitat quality from logging and road construction since that will occur outside of buffers protecting the streams (FS762), and that measures to protect bull trout from entering work area would successfully keep affected bull trout at a small number over the 10-year span of the Project (FS765-66; 774).  *Defs.' Mem.* at 21.  Finally, FWS imposed a duty on the Forest Service to monitor stream turbidity and to make rapid adjustments to Project activities should levels become excessive (FS775; 765-66).  *Id.*

**FEIS**

After receiving the Bi-Op, the Forest Service issued its FEIS on February 14, 2012. (FS215-544.)  The Forest Service concluded based on the Bi-Op that "[n]o sustained degradation of fish habitat would occur under any action alternative and all action

alternatives are expected to result in long term improvement in watershed and stream conditions."  (FS319.)

While logging may not have been specifically addressed in the section on bull trout and bull trout habitat, the Forest Service did address it in other areas of the FEIS.  For example, the FEIS addressed timber harvest in the Major Conclusions (FS223), Hydrology (FS296-311), and Fisheries (FS311-320) sections of the FEIS.

**Major Conclusions**

The Forest Service noted that "modeling indicates that timber harvest activities would have increases in water yield for all prescription watersheds and that "[a]ll modeled changes are well below thresholds where detrimental local effects might be observed" and that "[a]ny changes in timing or amount of streamflow under the action alternatives would be confined to small channels in the upper reaches of the watershed" and that "[n]o effects related to water yield would be notable beyond the analysis area at the mouth of the Little Slate Creek."  (FS223-24.)  They also estimated the potential cumulative detrimental soil disturbance within harvest units between 4 to 25.6%.  (FS224.)  While noting some slight excesses in Forest Plan and regional soil standards under various alternatives, the Forest Service concluded that implementation of Project design measures and best management practices would ameliorate those effects.  (FS224.)

The FEIS contains several other references to timber harvest as it relates to water.  For example, it states that "PACFISH default buffers would be used to define timber sale

unit boundaries. No timber harvest would occur within 300 feet of fish-bearing streams, 150 feet of perennial non-fish bearing water, wetlands > 1 acre; or 50 feet of intermittent streams, wetlands < 1 acre or landslide prone areas." (FS259.)  Also, "[t]he timber sale administrator would monitor Best Management Practices (BMPs) for harvest activities. (FS261.)

### Hydrology Section

The Forest Service notes that "[f]or each of the prescription watersheds, all Action Alternatives include timber harvest, and road reconstruction and decommissioning.  At the levels planned, the activities would be considered an entry when compared to the Forest Plan standard.  All Action Alternatives are within Forest Plan Appendix A guidelines for this indicator."  (FS304.)  It continues that "[a]ll proposed activities that have soil disturbance are expected to have short term increases in sediment delivery to stream channels, including vegetation treatments, road treatments, and restoration activities.  As modeled, the short-term effects from vegetation and road construction treatments are expected to be within acceptable Forest Plan guidelines."  (FS304.)  Summarizing the direct and indirect effects of each activity, the Forest Service again noted that proposed vegetation treatments would result in only short-term increase in sediment loads, that project design criteria would reduce any ill effects, and that "hillslope erosion would rapidly decrease to immeasurable amounts" as ground cover is reestablished.  (FS304.)  Indeed, the overarching theme regarding any of the activities is that short-term effects, if

**MEMORANDUM DECISION AND ORDER - 50**

any, would lead to long-term benefits and improvement of riparian habitat.  (FS304-05.)

In addressing cumulative effects of the Project in the hydrology section, the Forest Service identified timber harvest as one of the actions which had the most notable management-related impacts, noted the relatively small area in which timber harvesting occurred in the past, and noted the current effects "as modeled by ECA and NEZSED, indicate that management-related sediment yields are within Forest Plan guidelines and projected increases in water yield is below thresholds of concern for all prescription watersheds affected by this project."  (FS306.)  They also noted that the effects of prior timber harvesting such as "changes in sediment and water yield" "have already diminished to immeasurable levels."  (FS308.)  The Forest Service continued that "all action alternatives indicate an increase in sediment yield initially and a decrease in sediment yield (below existing conditions) within ten years of project implementation."  (FS308.)  Referring to Figure 1, "Little Slate Creek Sediment Yields Years 2009-2021 Little Slate Alternatives A-D," the Forest Service noted that for all alternatives, "timber harvest activities are modeled to have increases in water yield for all prescription watersheds" and that "[a]ll modeled changes are well below thresholds where detrimental local effects might be observed."  (FS309.)  The Forest Service concluded that "[w]hen all past, present, and proposed project activities are considered together, it is expected that there will be no significant adverse cumulative watershed effects.  When all proposed project activities are considered, all Action Alternatives are expected to have a net, long-term,

**MEMORANDUM DECISION AND ORDER - 51**

beneficial (positive) cumulative watershed effect for hydrology-related indicators."
(FS309.)  Finally, it concluded that "[t]here are no effects to watershed resources in Little
Slate from this project that are considered fully irreversible or irretrievable" and that
"instream improvements are intentionally designed to be effective in the long term, but
could be removed or reconfigured in the future if warranted."  (FS309.)

### Fisheries

In addressing stream conditions and the aquatic species found in the Little Slate
Creek watershed, the Forest Service noted that "[t]here would be no direct effects to
streams from timber harvest due to the retention of RHCAs [riparian habitat conservation
areas]"  (FS315.)  While recognizing that there may be some increased sediment runoff, it
concluded that the implementation of BMPs and timing restrictions would reduce the risks
and the effects would be localized and short-term.  (FS315.)  The FEIS addressed grazing
in the four allotments in the Project area and found that one has been vacant for ten years
with no plans to restock, that one has sixteen cow calf pairs and no sheep since 2007, that
one has seen "little use" from cattle, and that the fourth has only seventy cow calf pairs in
its entire allotment of almost 390,000 acres, 6, 400 of which are in the Project area.
(FS317-18.)  It determined the effects of grazing to be minor.  (FS318.)

In response to a question from the public regarding sediment from timber
harvesting activities, the Forest Service noted that sediment yield from timber activities
and other activities is modeled with NEZSED, and the results of the model runs indicate

that sediment yields will be below Forest Plan Appendix A objectives and the future

sediment yields will be less than existing sediment yields.  (FS395.)  Many members of

the public expressed concerns about the sediment yield from timber harvesting activities.

(FS395-98.)  Some members of the public specifically addressed the effects of timber

harvesting activities with regard to bull trout.  (FS399-400.)  The Forest Service

responded that "[t]here would be no direct effect to streams from timber harvest due to the

retention of RHCAs. No harvest is proposed in these buffers, which essentially leaves all

habitats intact and allows for future habitat development, including shading, stream bank

protection and large wood input. All action alternatives are expected to result in a long

term improving trend in cobble embeddedness. All action alternatives are expected to

result in a trend toward meeting prescription watershed fish/water quality objectives over

time. The FISHSED analysis shows no substantial changes in habitat quality relating to

model predicted sediment for any of the action alternatives."  (FS399.)

     Based on the extensive information cited above, the Court finds that the Agencies

took a hard look under NEPA and adequately considered the cumulative effects of timber

harvesting, mining, grazing, and other activites on the bull trout under the ESA either

through direct reference or by addressing sediment yield on watershed and fishery

sections of the FEIS.  The Court is especially convinced of the adequacy of its

consideration given the fact that only 1.27 miles of streams are involved.  *See Rock Creek*

*Alliance v. U.S. Fish and Wildlife Service*, 663 F.3d 439, 442-43 (9th Cir. 2011)

(upholding FWS finding of "no adverse modification" conclusion where the amount of designated critical habitat far exceeded the amount of affected habitat and determination was based also on relatively short duration and somewhat lower functionality).

> **(b)** ***Failure to Use the Best Available Science in Violation of the ESA and NEPA***

Plaintiffs characterize the Forest Service's information on the status of the "highly imperiled bull trout population in the Project area" and its habitat as "very limited" and yielding "stale and unreliable" habitat determinations. *Pls.' Mem.* at 24. They contend that the Forest Service's use of limited information from the 1990s updated with 2007 data in its habitat analysis constitutes a failure to take a hard look at Project effects on bull trout in violation of NEPA, failure to use the best available science in violation of the ESA, and failure to base its determinations on substantial supporting evidence in the record is a violation of the APA and NEPA. *Id.* at 24-25.

At the outset, as Defendants point out, Plaintiffs have failed to identify better data that the FWS should have considered. *Defs.' Mem.* at 20. "The best available data requirement [of the ESA] 'merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.'" *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (quoting *Southwest Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C.Cir. 2000)). Condensing this principle to its essence, FWS "cannot ignore available biological information." *Id.* at 1080-81 (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).

**MEMORANDUM DECISION AND ORDER - 54**

In their Reply, Plaintiffs continue their best available science argument but continue to fail to point out any better sources of information or studies.  Rather, they question the Forest Service's failure to have more definitive information despite the Forest Plan requirement that field based monitoring occur every 1-5 years for fish habitat trends by drainage and every year for impacts of management activities on water quality and various other Plan monitoring requirements.  *Pls.' Reply* at 13.  Plaintiffs also point to weaknesses of the two models, NEZSED and FISHSED, used by the Forest Service.  *Id*. at 12-13.

Defendants claim "Plaintiffs attempt to dodge this issue [of not identifying better science] by listing data and models not currently available."  *Defs.' Reply* at 10 (citing *Pls.' Reply* at 11-12).  The Court agrees.  Plaintiffs' failure to identify any better science or to point that any other existing data is available makes this claim a "non-starter."  In any event, the Forest Plan dictates the use of the NEZSED model and the model does, in fact, model haul trucking traffic contrary to Plaintiffs' allegations.  (FS297-98.) Furthermore, its conclusions regarding past mining and grazing are based on observation and not on models.  *Defs.' Reply* at 13.  Finally, the 2007 data on cobble embeddedness used by the Forest Service was not stale given that it was collected after the Project analysis was begun in 2006.

**MEMORANDUM DECISION AND ORDER - 55**

**5.      The Forest Service's Alleged Violation of NFMA and NEPA by Allowing Logging in Drainages that Do Not Show a Positive, Upward Trend in Habitat Capacity as Required by the Forest Plan Because the Forest Service Has Failed to Take a Hard Look at Project Effects on Aquatic Habitat**

The FEIS notes that past activities such as mining, logging, road building, and grazing have altered floodplain function and instream conditions in the Little Slate Creek watershed and that the Forest Plan (1987) identifies the watershed as not currently meeting fish/water quality objectives thus mandating an upward trend in aquatic habitat carrying capacity.  (FS231.)   Despite these facts, the FEIS also notes that the Idaho Department of Environmental Quality has determined that the area supports beneficial uses such as providing habitat for threatened steelhead and bull trout both of which are listed under the Endangered Species Act.  (FS231.)  The Forest Service concluded that "[w]atershed improvement activities proposed with this project would improve aquatic/watershed conditions and trend toward meeting Forest Plan objectives and desired aquatic conditions."  (FS231.)  The Implementation Guide to Appendix A of the Forest Plan states that "[u]pward trend means that stream conditions determined through analysis to be below Forest Plan objective will move toward the objective over time."  (FS13399.) The upward trend may be shown either by demonstrable existing improvement that will continue to grow or an improving trend will result from past, present, and future management activities.  (FS13399.)

Plaintiffs contend that because the Little Slate watershed is identified as not meeting Forest Plan objectives, timber activities cannot take place unless the habitat

**MEMORANDUM DECISION AND ORDER - 56**

capacity shows a positive upward trend which the Forest Service has not demonstrated. *Pls.' Mem.* at 25.  Plaintiffs are critical of the Forest Service's use of "an extremely limited amount of field data [regarding cobble embeddedness] collected in 1994/95 and again in 2007" from apparently different streams to support their conclusion that there was a decrease in cobble embeddedness in four of six prescription watersheds and thus an upward trend.  *Id.*  Plaintiffs contend at that the only "statistically validated, agency-commissioned sample data," the 1998 Forest Service-commissioned Huntington Report, actually showed that fish habitat quality declined through an increase in cobble embeddedness.  *Id.* at 26.  This study was included in the Administrative Record but not mentioned in the DEIS or FEIS.  *Id.*  Noting that the Forest Plan's stated intent that field based monitoring be used to determine trends, Plaintiffs cite the lack of monitoring or data on habitat capacity in various documents.  *Id.* at 27 (citing, *e.g.*, FS4476; 4176; 4038; and 4040).  They again criticize the NEZSED and FISHSED models used.  *Id.* at 28.

### A.     NFMA

Defendants counter that the Forest Plan contains different management standards for different watershed categories, and it has complied with NFMA by adhering to the Forest Plan standard that allows logging in watersheds that need improvement.  *Defs.' Mem.* at 25.  Four Project area watersheds are categorized as "category 2" (and not category 1 as stated by Plaintiffs) due to excess sediment and other concerns.  *Id.*  (citing FS2672, 2677).  The Forest Plan standard applicable to category 2 watersheds states:

"Timber management can occur in these watersheds, concurrent with habitat improvement efforts, as long as a positive, upward trend in habitat carrying capacity is indicated." *Id.* (citing FS2677).  The Forest Service contends that the Project complies with the relevant Forest Plan standards based on both its watershed restoration measures and the upward trend based on historical data.  *Id.* at 26.

### (1)    *Watershed Restoration*

The Forest Plan states that "if any watershed restoration has been implemented  . . . an upward trend [can] be assumed . . . ."  (FS4094.)  The Project includes several watershed restoration measures directed at reducing sediment over time.[13]  Indeed, the primary purpose of the Project is to improve habitat.  Furthermore, the Forest Service noted that existing buffers had already prevented logging around streams and had been

---

[13]   According to the Forest Service, these restoration measures include:

- Maintaining existing buffers that prevent logging around streams and that have been shown to improve the environment in and around streams over time (FS319; FS331; FS10765 (noting improvements in bank stability and fish habitat));

- Stabilizing 13 stream channels, removing 48 road and 25 stream crossings, decommissioning 49 miles of roads and 4 miles of trials (sic), improving 11 road and 48 trail stream crossings, and improving 15 miles of other roads, all of which will reduce sediment in streams in Project area watersheds (FS258; FS582; FW591);

- Using the best management practices contained in the Idaho Forest Practices Act (FS490-511) (discussing how dozens of state-recognized best practices will be implemented)); and

- Monitoring Project activities and streams to make sure that these measures are working (FS587; FS631; FS2717).

*Defs.' Mem.* at 26.

**MEMORANDUM DECISION AND ORDER - 58**

shown to improve the environment in and around the streams by improving bank stability and fish habitat.  (FS319;331; 10765.)  Thus, an upward trend can be assumed according to the Forest Plan.

### (2)   *Historical Data*

Next, the Forest Service notes that it compared historical data on cobble embeddedness from 1994-95 with 2007 data in some of the same Project area streams and found a positive trend in the Project watersheds (FS313; 397;12086-87).  *Id*. at 26.

A review of the FEIS reveals that the Forest Service identified "chronic sediment influencing cobble embeddedness and percent surface fines [as] the most predominant factor affecting Forest Plan objectives."  (FS313.)  However, a comparison of the cited data suggested an improvement in fish habitat parameters since the writing of the Forest Plan in 1987, although Project area streams remained below Plan objectives.  (FS313.)  In support of its conclusion on upward trend, the Forest Service presented a Cobble Embedded Spreadsheet containing the data from the two time-periods quantifying the improvement.  (FS12086-87.)

The Forest Service believed that it was more reasonable to use 2007 data compared with 1994-95 data than it was to use the 1998 Huntington report favored by Plaintiffs which covered only 1989-95.  *Id*. at 27.  Plaintiffs' primary argument is that only the Huntington report is "statistical."  However, the Implementation Guide to Appendix A of the Forest Plan states that inferences can be made regarding trend even if the data does not

**MEMORANDUM DECISION AND ORDER - 59**

result in a statistically significant trend.  (FS4094.)

The Forest Service may choose its methodology for validating its hypotheses and determining whether it has complied with its Forest Plan.  *Lands Council v. McNair*, 629 F.3d 1070, 1078 (9th Cir. 2010).  Courts must defer to the Forest Service's "technical expertise where the record demonstrates that the agency reasonably relied on data concluding the Project meets the standards imposed by the NFMA."  *Id*. at 1076.  *See also Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1072 (9th Cir. 2005) ("When the administrative agency has provided relevant data supporting its decision, we owe deference to the agency's line-drawing.").

The Ninth Circuit has recognized that the NFMA provides an inherently flexible framework to accommodate the Forest Service's need to balance competing interests.  *See generally Earth Island Institute v. Carlton*, 626 F.3d 462, 470 (9th Cir. 2010); *McNair*, 537 F.3d at 992.  It  does not dictate how the Forest Service must demonstrate compliance with its Forest Plan.  *Id*.  The Forest Service will be held to have acted arbitrarily and capriciously "only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan."  *McNair*, 537 F.3d at 993-94.  "Courts may not impose 'procedural requirements not explicitly enumerated in the pertinent statutes.'"  *Earth Island*, 626 F.3d at 472 (citing *McNair*, *id*.).

Here, the Forest Service's reliance on the data comparisons between 1994-95 and

**MEMORANDUM DECISION AND ORDER - 60**

2007 was reasonable given that the 2007 data was more current than the 1998 Huntington data.  Indeed, in the context of another argument, Plaintiffs characterized 2006 data as stale yet urges here that the Forest Service should have used the 1998 Huntington Report.

**B.    NEPA**

The Forest Service contends that it complied with NEPA by both complying with the Forest Plan's "upward trend" standard and applying the NEZSED and FISHSED models as required by the Plan to measure changes in fish habitat due to logging and road construction.  *Id*. at 28 (citing FS297; 694; and 4100).  Sediment yields for the Project area's watersheds met their Forest Plan guidelines before and after Project activities.  *Id*. The Forest Service rejects Plaintiffs' argument that it did not have the necessary fish density data for the FISHSED model because such data is only required if Project activities will change habitat quality by more than 10 percent which they will not here.  *Id*. and n.19 (citing FS10486; 10496; 12139; 10498; and FS315-16).

The Forest Service views Plaintiffs' claims to be an improper attempt to litigate the Forest Plan's validity regarding aquatic habitat.  *Defs.' Reply* at 14. The Court agrees.  To the extent that Plaintiffs raise issues not previously raised, the Court lacks jurisdiction to consider the Forest Plan challenges regarding aquatic habitat.

The Court cannot "second-guess methodological choice made by an agency in its area of expertise."  *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993).  The Forest Service has complied with the directives of the Forest Plan, and, as

**MEMORANDUM DECISION AND ORDER - 61**

discussed above in the context of the bull trout issue, properly relied on the 2007 cobble

embeddedness data.  As also stated above, the Forest Service's use of the NEZSED and

FISHSED models was dictated by the Forest Plan.  The models allowed a comparison of

Project alternatives and the choice of the proposal that would have the lowest long-term

sediment yields for all but one of the Project area watersheds and the most long-term

positive effect on fish habitat.  (FS304.)  Plaintiffs' attempts to introduce planning level

monitoring objectives to the Project are unwarranted.  The Court finds that the Forest

Service complied with NEPA in analyzing Project effects on aquatic habitat.

## CONCLUSION

After conducting the mandated substantial inquiry and probing review, the Court

finds that Defendants did not act arbitrarily or capriciously in approving the Little Slate

Project.  *See Siskiyou*, 565 F.3d at 554.  It further finds that Defendants' conclusions are

well supported and reasonable.  Plaintiffs have not shown that the agencies relied on

factors Congress did not intend it to consider, failed to consider an important aspect of any

issue, offered an explanation counter to the evidence before them or was otherwise

implausible.  *See McNair*, 537 F.3d at 987.  In making its determination, the Court was

mindful that it is to give substantial deference to the Forest Service's interpretation and

implementation of its Forest Plan.  *See Great Old Broads for Wilderness*, 709 F.3d at 850.

Finally, it was mindful that it must not assume the role of a scientist.  *See McNair*, 537

F.3d at 988.

## REQUEST FOR INJUNCTIVE RELIEF

Plaintiffs had made an unsupported request that the Court enjoin implementation of the Project.  Based on the foregoing decision, the Court finds the request for injunctive relief to be moot given that Plaintiffs have not prevailed on the merits.  *See Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1054 (9th Cir. 2013) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 20, 32 (2008)).

## ORDER

**IT IS ORDERED that:**

1.     Plaintiffs' Motion for Summary Judgment (Dkt. 23) is **DENIED**.

2.     Defendants' Motion for Summary Judgment (Dkt. 24) is **GRANTED**.



DATED: November 27, 2013

_____

Honorable Mikel H. Williams
United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 63**